Theodore & Joyce ALEXANDER, Husband and Wife; on behalf of themselves And all others similarly situated, Appellants,

v.

PSB LENDING CORPORATION, et al., Appellees.

No. 82A04–0212–CV–592.

Court of Appeals of Indiana.

Dec. 31, 2003.

Daniel Myers, Kevin Oufnac, Richardson Patrick Westbrook & Brickman, LLC, Mount Pleasant, SC, Eric G. Calhoun, Lawson Fields McCue & Campbell, P.C., Addison, TX, Stephen L. Williams, Mann Law Firm, Terre Haute, IN, Attorneys for Appellants.

Terry Farmer, Michele S. Bryant, Bamberger Foreman Oswald & Hahn, LLP, Evansville, IN, Mark S. Melodia, Lauren Graham Delehey, Reed Smith LLP, Princeton, NJ, Thomas L. Allen, Roy W. Arnold, Reed Smith LLP, Pittsburg, PA, David Sturgeon–Garcia, Reed Smith LLP, San Franciso, CA, Ronald J. Ehinger, Michael H. Michmerhuisen, Barrett & McNagny LLP, Ft. Wayne, IN, Brian K. Carroll, Johnson Carroll Griffith & D'Amour, Evansville, IN, Russell J. Pope, Gregory Lockwood, Pope & Hughes, Towson, MD, Richard Malad, Cohen & Malad LLP, Indianapolis, IN, Alan S. Brown, Locke Reynolds LLP, Indianapolis, IN, Steven K. Huffer, Huffer & Weathers, P.C., Indianapolis, IN, Michael J. Feiwell, Indianapolis, IN, Danny E. Glass, Fine & Hatfield, Evansville, IN, Pamela M. Conover, Ward B. Coe, III, Whiteford Taylor & Preston LLP, Baltimore, MD, Cory Brundage, Indianapolis, IN, Daniel J. Tobin, Kirkpatrick & Lockhart LLP, Washington, DC, Paul E. Ridley, Kirkpatrick & Lockhart LLP, Dallas, TX, Patrick A. Shoulders, Robert L. Burkart, Ziemer Stayman Weitzel & Shoulders LLP, Evansville, IN, James D. Johnson, Rudolph Fine Porter & Johnson LLP, Evansville, IN, Robert R. Clark, R.C. Richmond, III, Andrew T. Kight, Sommer Barnard Ackerson, Indianapolis, IN, Jeffrey W. Ahlers, Steven S. Hoar, Kahn Dees Donovan & Kahn, LLP, Evansville, IN, Robert K. Stanley, David R. Hamer, Erica S. Black, Baker & Daniels, Indianapolis, IN, Peter A. Velde, Eric Johnson, Kightlinger & Gray, Indianapolis, IN, Attorneys for Appellees.

## OPINION

FRIEDLANDER, Judge.

Between October 10, 2001 and February 4, 2002, nine putative class action complaints were filed in Vanderburgh County by plaintiffs-appellants (Named Plaintiffs) on behalf of individuals and/or married couples, as well as those similarly situated, who had obtained loans secured by second mortgages on their Indiana homes.[1] All nine complaints alleged similar violations of the Indiana Uniform Consumer Credit Code (IUCCC), namely, that excessive (greater than 2%) origination fees were

---

**1.** The nine putative class actions were: (1) *Alexander v. PSB Lending Corporation;* (2) *Davis v. Century Financial Group, Inc.;* (3) *Hayes v. IMPAC Funding Corporation;* (4) *Hertwick v. Dollar Mortgage Corporation;* (5) *Simms v. Independent Realty Capital Corporation;* (6) *Osterman v. Mortgage Lenders Acceptance Corporation;* (7) *Warner v. Empire Funding Home Loan Owner Trust 1997–1;* (8) *Drake v. Bann–Cor;* and (9) *Lytle v. Firstplus Home Loan Trust 1996–2.*

charged on their second mortgage loans in violation of Ind.Code Ann. § 24–4.5–3–201(8) (West, PREMISE through 2003 1st Regular Sess.). Each complaint identified the respective lender (the Originator) that initially made the second mortgage loans to Named Plaintiffs, but only some of the complaints named the Originator as a defendant. Additionally, the complaints named over eighty entities as defendants (Non–Holder Defendants) who were not alleged to have originated or held Named Plaintiffs' loans, but rather were alleged to have purchased loans issued by the Originators to borrowers other than Named Plaintiffs. No complaint identified the current holder of Named Plaintiffs' loans.

In May 2002, the trial court consolidated the nine putative actions for pretrial purposes. All appearing defendants filed motions to dismiss alleging a variety of defects in Named Plaintiffs' complaints. The trial court heard oral argument in September 2002, and on November 11, 2002, entered a Dismissal Entry dismissing all nine putative actions for various reasons:

> The defendants having filed their motions to dismiss, and the plaintiffs having filed their responses thereto, and the Court having heard the argument of counsel and being duly advised in the premises, now finds that all motions to dismiss of all defendants should be granted, based where applicable upon lack of personal jurisdiction, lack of standing, lack of standing based on bankruptcy of the particular plaintiff, arbitration agreement, and/or the "safe harbor provision" of I..C. [sic] 24–4.4–6–104(2)[sic].

*Appellants' Appendix* at 41.[2] The Dismissal Entry did not identify which Defendants were dismissed for which reason.

On appeal, Named Plaintiffs contend that the trial court improperly granted the Defendants' motions to dismiss. The following issues are dispositive of our review:

1) Did the trial court correctly determine that Named Plaintiffs lacked standing against the Non–Holder Defendants?

2) Did the trial court correctly determine that Named Plaintiffs failed to state a claim based on the "safe harbor" provision of the IUCCC? [3]

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.[4]

---

2. In addition to standing, personal jurisdiction, and the merits of the IUCCC claim, arbitration agreements and bankruptcy were raised as unique defenses to the *Davis, Hertwick,* and *Warner* claims. After filing of the Dismissal Entry, the *Davis, Hertwick,* and *Warner* plaintiffs voluntarily dismissed their suits and, as such, these issues were not appealed. The remaining Named Plaintiffs have also dismissed several of the entities from the appeal: Life Bank, F.S.B., Life Financial Home Loan Owner Trust 1997–3, and Wilmington Trust Company. This appeal relates only to the claims asserted in the six remaining putative actions—*Alexander, Hayes, Simms, Drake, Osterman,* and *Lytle*—against the sixty-six remaining Defendants.

3. The trial court's Dismissal Entry did not dismiss any of the Defendants based on the merits of the parties' substantive arguments regarding the IUCCC's origination fee provision; rather, the trial court found that the safe harbor provision of the IUCCC was applicable and dismissed some unidentified Defendants on that ground.

4. We heard oral argument in this matter on November 3, 2003, in Indianapolis. We commend counsel on the quality of their presentations, especially in light of the complicated procedural and factual nature of the case. Also, we note that at oral argument, Defendants cited to a recent Seventh Circuit decision, *Purdue Research Found. v. Sanofi–Synthelabo, S.A.,* 338 F.3d 773 (7th Cir.2003), decided after briefing of the instant case was completed. Defendants' counsel cited *Purdue* in support of their personal jurisdiction arguments. We note receipt of Appellants' Motion

The facts are undisputed that Named Plaintiffs obtained loans secured by second mortgages on their Indiana homes between April 1997 and August 2000. The loans originated from six different lenders and ranged in amount from $17,000 to $35,000. Only two Originators remain in this appeal, Bann–Cor Mortgage Corporation (Bann Cor) and Independent Realty Capital Corporation d/b/a Independent Mortgage Company (Independent Realty), Defendants in the *Drake* and *Simms* actions, respectively. No direct connection was alleged between the remaining sixty-four Non–Holder Defendants and Named Plaintiffs, rather, the Non–Holder Defendants are alleged holders of promissory notes *relating* to loans made to Named Plaintiffs and the putative class members. None of the complaints identifies the actual holders of Named Plaintiffs' loans.

In their complaints, Named Plaintiffs assert that the Defendants had violated the IUCCC, specifically, I.C. § 24–4.5–3–201(8), by charging more than a 2% origination fee as permitted by the statute. Defendants contend that charging more than a 2% origination fee is permissible so long as the total loan finance charge does not exceed 21% of the principal value of the loan as permitted by I.C. § 24–4.5–3–201(1). Alternatively, Defendants argue that the loan charges conformed with a written interpretation of the statute by the Department of Financial Institutions (DFI), the agency charged with administering and interpreting the IUCCC, and, thus, the IUCCC's "safe harbor" provision, I.C. § 24–4.5–6–104(2), shielded Defen-

dants from liability. Additionally, all Non–Holder Defendants moved to dismiss for lack of standing, and the IMPAC and Trust Defendants, a subset of the Non–Holder Defendants, moved separately to dismiss Named Plaintiffs' complaints for lack of personal jurisdiction.

Named Plaintiffs counter that they have established standing under Indiana law against all Non–Holder Defendants, and, alternatively, that standing may be properly determined on a classwide basis, via the juridical link doctrine, or through permissive joinder under Trial Rule 20. Named Plaintiffs assert that Indiana courts have personal jurisdiction over the IMPAC and Trust Defendants by virtue of these Defendants holding second mortgages on real property located in Indiana.

After a hearing, the trial court granted motions to dismiss as to all Defendants, and this appeal ensued. Named Plaintiffs argue that the trial court erroneously dismissed all Defendants based on lack of standing, personal jurisdiction,[5] and an incorrect interpretation of the IUCCC and its "safe harbor" provision.

■ Upon review of a trial court's dismissal for lack of standing, we apply a de novo standard of review. *Schulz v. State*, 731 N.E.2d 1041 (Ind.Ct.App.2000). The facts alleged in the complaint must be taken as true and only where it appears that under no set of facts could the plaintiff be granted relief is dismissal appropriate. *City of New Haven v. Allen County Bd. of Zoning Appeals*, 694 N.E.2d 306 (Ind.Ct.App.1998), *trans. denied.* Similar-

to File a Brief Response to Appellee's [sic] Newly Cited Case filed November 11, 2003, and have reviewed the attached Appellant's [sic] Submission in Response to Newly Cited Case. Since our ruling does not reach the personal jurisdiction question, *see infra* p. 7, we do not address the question of *Purdue's* applicability to the facts of the instant case.

5. Because our determination of the standing issue affirms the dismissal of the Non–Holder Defendants, of which the IMPAC and Trust Defendants are a subset, we do not reach the issue of whether the trial court's dismissal for lack of personal jurisdiction was proper.

ly, statutory interpretation is a question of law reserved for the court and is reviewed de novo. *In re K.J.A.* 790 N.E.2d 155 (Ind.Ct.App.2003).

### 1.

 Standing is a fundamental, threshold, constitutional issue that must be addressed by this, or any, court to determine if it should exercise jurisdiction in the particular case before it. The issue of standing focuses on whether the complaining party is the proper one to invoke the court's power. *Scott v. Randle,* 736 N.E.2d 308 (Ind.Ct.App.2000). The standing requirement assures that litigation will be actively and vigorously contested, as plaintiffs must demonstrate a personal stake in the litigation's outcome in addition to showing that they have sustained, or are in immediate danger of sustaining, a direct injury as a result of the defendant's conduct. *Id.* To establish standing, therefore, a plaintiff must demonstrate a personal stake in the outcome of the lawsuit and that the injury is a result of the defendant's conduct. *Hibler v. Conseco, Inc.,* 744 N.E.2d 1012 (Ind.Ct.App.2001). If properly challenged, when a plaintiff fails to establish standing in the pleadings, the court must dismiss the complaint. *Schulz v. State,* 731 N.E.2d 1041. Moreover:

> Although the Indiana constitution contains no "case or controversy" requirement, the federal limits on justiciability are instructive, because the standing requirement under both federal and state constitutional law fulfills the same purpose: ensuring that the litigant is entitled to have the court decide the merits of the dispute or of particular issues.

*Id.* at 1044. Under the federal test, to establish standing a plaintiff must allege a personal injury that is fairly traceable to the defendant's allegedly unlawful conduct and is likely to be redressed by the requested relief. *Id.* (citing *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

Named Plaintiffs contend they have standing to maintain claims against all sixty-six remaining Defendants—the two Originators, Bann–Cor and Independent Realty, and the sixty-four Non–Holder Defendants. We agree that Ernest and Mary Drake and Dean and Laura Simms have standing to assert claims against Bann–Cor and Independent Realty, respectively, who are the Originators of their loans and named Defendants in their complaints.[6] Since Bann–Cor and Independent Realty originated the second mortgage loans and charged the alleged excessive origination fee directly from the Drakes and Simms, respectively, a personal stake and potential injury caused by those Defendants is clearly demonstrated. Defendants impliedly concede this point in their briefing, as their standing arguments reference only the Non–Holder Defendants.[7] The standing issue, therefore, relates only to the Non–Holder Defendants, i.e., the sixty-four defendants not alleged in the complaints to hold or to have ever held any of Named Plaintiffs' second mortgage loans.

 Standing requires a concrete adversity between the parties, that is, that the defendant caused plaintiff's injury and therefore the defendant is the proper party from whom to seek redress. Named

---

**6.** Independent Realty filed a separate appellee brief adopting all the arguments raised in the Joint Brief but asserting its own unique defense based on Dean and Laura Simms' loan documentation. Independent Realty's brief, however, does not raise standing as a defense and the Joint Brief's standing argument relates only to the Non–Holder Defendants.

**7.** Defendants explicitly conceded this point at oral argument.

Plaintiffs' complaints do not allege that the sixty-four Non–Holder Defendants are current or former holders of the second mortgage loans at issue, nor do Named Plaintiffs allege any relationship between themselves and the Non–Holder Defendants, contractual or otherwise. Rather, the complaints merely contend that the Non–Holder Defendants hold promissory notes *related* to the mortgage loans made to Named Plaintiffs and the putative class members. Named Plaintiffs, therefore, fail to establish any personal stake in their lawsuits against the Non–Holder Defendants, and cannot establish any injury or harm caused by the Non–Holder Defendants. Even assuming Named Plaintiffs were correct, i.e., that the loan origination fees were excessive, it would be impossible for Named Plaintiffs to recover from the Non–Holder Defendants who have no alleged connection to them or their loans. In short, the Non–Holder Defendants are not proper defendants. As to Named Plaintiffs, dismissal of the Non–Holder Defendants on the basis of standing was proper.[8]

Attempting to overcome this fatal defect in their complaints, Named Plaintiffs assert that standing may be properly determined: (1) on a classwide basis; (2) via the so-called juridical link doctrine, or (3) through permissive joinder under T.R. 20.[9] We address each argument in turn, but find none persuasive.

First, Named Plaintiffs contend that standing may be determined on a classwide basis so long as the requirements of Fed. R. Civ. Pro. 23 are met. That is, if a class is certified, Named Plaintiffs will acquire standing by virtue of the Non–Holder Defendants holding notes of now-absent class members. In support of this contention, Named Plaintiffs rely on *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), in particular, the following quote: "But the class certification issues are, as they were in *Amchem*, 'logically antecedent' to Article III concerns, and themselves pertain to the statutory standing which may properly be treated before Article III standing." *Id.* at 831, 119 S.Ct. 2295 (citations omitted).

**8.** Interestingly, while Named Plaintiffs' complaints fail to identify the actual holders of their notes, *Appellants' Appendix* includes "Summary of Class Representative Loans," a narrative detailing current and former holders of the notes, as well as assignment documents. *See Appellants' Appendix* at 371–78. Such after-the-fact identification of the former or current holders of the notes was improper, not presented to the trial court, and will not be considered on appeal. We also note that Named Plaintiffs had the ability to amend their complaints post-dismissal to include this information but instead chose to pursue this appeal. *See* Ind. Trial Rule 12(B).

**9.** In their Joint Reply, the Non–Holder Defendants also raise and rebut an argument raised by Named Plaintiffs to the trial court that standing exists through application of the Home Ownership and Equity Protection Act (HOEPA), 15 U.S.C. § 1641(d) (West 2003), an amendment to the Truth in Lending Act.

Named Plaintiffs address this argument in their Reply Brief. HOEPA eliminates the holder-in-due-course defense for assignees of certain mortgages when the assignee holds the loans. Named Plaintiffs' complaints, however, do not assert a violation of HOEPA nor do the Non–Holder Defendants ever assert a defense based on HOEPA. Additionally, the express terms of HOEPA make it only applicable to holders or assignees of mortgages: "Any person who purchases or is otherwise assigned a mortgage referred to in section 1602(aa) of this title shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage . . . ." 15 U.S.C. § 1641(d)(1). As discussed previously, Named Plaintiffs' complaints do not assert that any of the Non–Holder Defendants ever held or were assigned any of the second mortgages at issue. Therefore, this tangential argument does not save Named Plaintiffs' claims against the Non–Holder Defendants.

We find *Ortiz,* and the standing issue it addressed, inapposite.

*Ortiz* involved a global settlement of an asbestos class action under Fed. R. Civ. Pro. 23. The settlement class consisted of persons with potential claims for personal injuries not yet manifested at the time of settlement. The issue presented, therefore, was if a case or controversy existed without an injury in fact.[10] Without resolving the standing issue, the Court held that the trial court's certification of the class on a limited fund rationale was improper and rejected the settlement. Recognizing the unique situation presented, the Court prefaced the above-quoted passage with: "Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits." *Ortiz v. Fibreboard Corp.,* 527 U.S. at 831, 119 S.Ct. 2295. Therefore, in the narrow factual context of a global settlement of unrealized asbestos claims, the *Ortiz* Court commented that class certification could be considered before standing.

▮ The facts of the instant case are readily distinguishable. Unlike the putative plaintiffs in *Ortiz,* if Named Plaintiffs have an injury at all, that injury has already occurred and a concrete claim exists. The specific issue presented here, therefore, is if the Non–Holder Defendants are the proper parties to redress Named Plaintiffs' alleged harm. In that regard, we find the Seventh Circuit's opinion in *Jackson v. Resolution GGF Oy,* 136 F.3d 1130 (7th Cir.1998), more helpful and on point. In *Jackson,* a group of borrowers filed a complaint on behalf of a putative class alleging that lenders had charged points in excess of those permitted by Illinois law. In affirming the dismissal of a non-holder defendant, the Seventh Circuit held:

> [T]here is a question what Norwest Financial Illinois, Inc., one of the defendants, is doing in any court. Norwest has bought some of Harbor's paper but does not hold the notes signed by any of the plaintiffs, and it asked the court to dismiss it from the case on the ground that none of the plaintiffs had standing to pursue a claim against it. The district judge did not act on this motion. Like any other jurisdictional issue, this subject should have received priority consideration. Norwest's position is impeccable. Some other borrowers may have claims against it, but none of these plaintiffs does—and as the case was not certified as a class action, the only claims before the court are those of the plaintiffs personally. We need not decide whether Norwest would have been a proper defendant had a class been certified even though none of the representative plaintiffs held a legal claim against it. There is no case or controversy between Norwest and any of Named plaintiffs so Norwest must be dismissed as a party.

*Jackson v.* 136 F.3d at 1132. The holding in *Jackson* is more persuasive—and applicable—than Named Plaintiffs' citation to the out-of-context sentence from *Ortiz.* Standing, as a threshold, jurisdictional issue, must be given priority consideration. Additionally, simply framing a lawsuit as a class action does not remove Named Plaintiffs' burden to demonstrate standing: "[E]ven named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other unidentified

---

**10.** This unique factual situation of *Ortiz* was also present in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), the case cited by the *Ortiz* court in the passage relied upon by Named Plaintiffs. *Amchem* also dealt with a global settlement of asbestos claims that had not yet manifested into injuries in fact.

members of the class to which they belong and purport to represent.'" *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (quoting *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

■ More importantly, it must be noted that in the case before us the "Class" has not been certified. The complaints are merely "proposed" class actions. We therefore reject Named Plaintiffs' argument that standing may be properly determined on a classwide basis against the Non–Holder Defendants.

Next, Named Plaintiffs ask this court to adopt the so-called juridical link doctrine to establish standing against the Non–Holder Defendants. The juridical link doctrine has never been cited to or approved by any published Indiana state court opinion. The doctrine, however, has been addressed in other jurisdictions, including the Northern District of Indiana and the Seventh Circuit, and Named Plaintiffs urge application of the doctrine to the instant case. Responding to Named Plaintiffs' argument requires a brief discussion and understanding of the juridical link doctrine and its application.

The juridical link doctrine is a judicial construct which developed largely from a Ninth Circuit decision, *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir.1973). As succinctly explained by the Seventh Circuit:

> *La Mar* held that a plaintiff without a cause of action against a specific defendant cannot 'fairly and adequately' protect the interests of those who do have such causes of action for purposes of Rule 23(a). Nevertheless ... the court went on to hold that if the plaintiffs as a group—named and unnamed—have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or otherwise 'juridically related in a manner that suggests a single resolution of the dispute would be expeditious,' the claim could go forward.

*Payton v. County of Kane*, 308 F.3d 673, 678–79 (7th Cir.2001). Post-*La Mar* case-law has applied the juridical link doctrine in limited factual circumstances, namely, where "all the defendants took part in a similar scheme that was sustained either by a contract or conspiracy, or was mandated by a uniform state rule." *Id.* at 679.

For example, in *Moore v. Comfed Sav. Bank*, 908 F.2d 834 (11th Cir.1990), the Eleventh Circuit noted that juridical links were most often found when a contractual obligation existed among all defendants or a state or local statute required common action by the defendants. *Id.*[11] Similarly, in *Payton v. County of Kane*, the Seventh Circuit applied the juridical link doctrine to a putative class action where arrestees brought an action against county sheriffs in nineteen different Illinois counties challenging bail bond fees collected pursuant to a state statute. 308 F.3d 673. The Seventh Circuit applied the doctrine, noting "given that the bail bond fee is im-

---

11. Named Plaintiffs assert that *Moore v. Comfed Savings Bank* is identical to their case. We disagree. *Moore* never expressly resolved the standing issue presented in the instant case. Rather, *Moore* addressed whether the defendants were properly joined pursuant to Fed. Rule Civ. Pro. 20(a). Thus, *Moore* does not support Named Plaintiffs' position that defendants are juridically linked when Named Plaintiffs' loans are originated by a common lender and then assigned to an unrelated defendant. Further, as distinguished by *Christiansen v. Beneficial Nat'l Bank*, 972 F.Supp. 681, 683 n. 2 (S.D.Ga.1997): "[T]he Court in *Moore* never addressed the issue of standing because the holding was based on the application of a procedural rule, which is distinct from a grant of jurisdiction and which cannot be used to expand the jurisdiction of the federal courts."

posed pursuant to a state statute, and that the county sheriffs are for this purpose an arm of the state ... it is reasonable for the putative plaintiff class to try to hold all the counties accountable within one suit." *Payton v. Kane,* 308 F.3d at 680. *See also Hopson v. Schilling,* 418 F.Supp. 1223 (N.D.Ind.1976) (finding a juridical link among defendants who were all government actors (township trustees) acting in accordance with state statutes); *Mudd v. Busse,* 68 F.R.D. 522, 527–28 (N.D.Ind. 1975) (construing *La Mar* and finding that " 'juridical links' would most often be found in instances where all members of a defendant class are officials of a single state and are charged with enforcing or uniformly acting in accordance with a state statute, or common rule or practice of state-wide application, which is alleged to be unconstitutional").

■ Here, Named Plaintiffs do not allege any of the factual circumstances that would warrant application of the juridical link doctrine. No contractual relationship, concerted conduct, or conspiracy between the Non–Holder Defendants is contended. In fact, the Non–Holder Defendants are largely competitors for the same business, thus undercutting any argument that they did, or would, act in concert with one another.[12] Named Plaintiffs also fail to allege any state of local statute requiring common action by the Non–Holder Defendants, nor are the Non–Holder Defendants alleged to be government actors. Thus, Named Plaintiffs fail to establish the narrow factual circumstances in which the juridical link exception has been found applicable. Moreover, we find persuasive a recent Supreme Court of Alabama decision, *Funliner of Alabama, L.L.C. v. Pickard,* 2003 WL 21205391 (Ala. May 23,

2003). The *Funliner* court rejected the trial court's certification of a defendant class based on the juridical link doctrine finding substantial due process concerns raised by the fact that each named plaintiff did not have a cause of action against each member of the defendant class:

> [T]he trial court attempted to rely upon the fact that each plaintiff and each defendant interacted in essentially the same manner and, therefore, the claims of the plaintiff class could relate to the defendant class as a whole ... the defendants sought to be named as a class in this action are not state officials charged with enforcing, or acting uniformly in accordance with, a state statute. They are simply business entities and individuals located throughout this state that have engaged in the business of operating or leasing video-gaming machines. The fact that the defendants engage in similar or related business is insufficient to overcome the due-process concerns raised by plaintiffs' attempt to certify a defendant class.

*Funliner v. Pickard,* 2003 WL 21205391, at * 17.

Based on the foregoing, we hold that the juridical link doctrine is inapplicable to the instant case and cannot cure the fatal defect in Named Plaintiffs' claims against the Non–Holder Defendants. To hold otherwise would expand the juridical link doctrine beyond the properly narrow context in which it has been applied and create the danger of misapplication by litigants attempting to circumvent the threshold requirement of standing.

■ Finally, Named Plaintiffs assert that applicability of the juridical link doctrine is similar to the analysis of per-

---

**12.** The fact that some of Named Plaintiffs' loans may have been processed by the Non–Holder Defendants in an identical fashion to achieve maximum returns does not alter this fact.

missive joinder under T.R. 20. Named Plaintiffs contend that the Non–Holder Defendants are proper defendants since Named Plaintiffs' claims, as well as those of the currently unknown class members, arise out of the same transaction, occurrence, or series of transactions and give rise to the same questions of law and fact. Ostensibly, Named Plaintiffs argue that T.R. 20 joinder may properly substitute for standing. We disagree. Permissive joinder is a procedural device, the nature of which "is to allow parties to be joined as defendants if the plaintiff has a cause of action against them. Thus, defendants may join as co-defendants only those parties which the plaintiff could have originally named as defendants under this rule, but for some reason chose not to." *City of Elkhart v. Middleton*, 265 Ind. 514, 520, 356 N.E.2d 207, 212 (Ind.1976). As discussed previously, the Named Plaintiffs lack standing, and a cause of action, against the Non–Holder Defendants. A procedural trial rule cannot trump this fundamental, threshold, and constitutional requirement.

In conclusion, as a matter of law, Named Plaintiffs have failed to meet their burden of demonstrating standing to assert claims against the sixty-four Non–Holder Defendants. The trial court's dismissal of the Non–Holder Defendants based on lack of standing was proper.

### 2.

Named Plaintiffs also challenge the trial court's determination that the "safe harbor" provision of the IUCCC warranted granting some of the Defendants' motions to dismiss. Since Named Plaintiffs lack standing to assert IUCCC claims against the sixty-four Non–Holder Defendants and

were properly dismissed by the trial court, only two defendants remain for our review: Bann–Cor (in *Drake*) and Independent Realty (in *Simms*). As previously noted, the *Drake* and *Simms* Plaintiffs have standing to assert claims against Bann–Cor and Independent Realty. Further, personal jurisdiction was not raised as a defense by either Independent Realty or Bann–Cor, and bankruptcy and arbitration agreements are not defenses to either of these Originators. Thus, we must determine if the "safe harbor" provision of the IUCCC provided a proper ground for dismissal of Bann–Cor and/or Independent Realty.[13]

First, while both parties assert that the trial court's ruling addressed the merits of their respective arguments regarding excessive origination fees under the IUCCC, the Dismissal Entry only addressed the application of the "safe harbor" provision. *Appellants' Appendix* at 41. The Dismissal Entry did not resolve the underlying merits of any of Named Plaintiffs' claims, including those of the Drakes and the Simms, under the origination fee provision of the IUCCC.

The April 10, 2002 letter from the DFI responded to an April 4, 2002 inquiry from Defendants' counsel. The letter offered explanations of various portions of the IUCCC, including: (1) I.C. § 24–4.5–3–202, charges that may be imposed on a consumer loan in addition to the loan finance charge, (2) I.C. § 24–4.5–3–201, maximum rates of a loan finance charge that can be contracted for on consumer loans; (3) I.C. § 24–4.5–3–201(8), loan origination fees; and (4) I.C. § 24–4.5–3–209(2), prepaid finance charges. The letter further stated: "The maximum loan

---

**13.** Independent Realty asserted a unique defense based on the Simms' loan documentation. We do not reach the issues presented in Independent Realty's brief, as we find that its

motion to dismiss was erroneously granted and remand the matter to the trial court for proceedings consistent with this opinion.

finance charge under I.C. 24–4.5–3–201 can include other 'points' or 'origination fee' [sic] as long as the total of all loan finance charges except for the contracted for loan origination fee allowed under I.C. 24–4.5–3–201(8) do not exceed the maximum twenty-one percent (21%) maximum rate." *Appellants' Appendix* at 313–14. Bann–Cor and Independent Realty claim this language and letter relieve them of any potential liability based on the "safe harbor" provision of the IUCCC.

 Interpretation of the "safe harbor" provision of the IUCCC is a matter of first impression for this court. Interpretation of a statute is purely a question of law and we, therefore, review the trial court's decision de novo. *In re K.J.A.*, 790 N.E.2d 155. The primary goal in interpreting the meaning of a statute is to determine and effectuate legislative intent. *Herron v. State*, 729 N.E.2d 1008 (Ind.Ct.App.2000). To determine legislative intent, we look to the plain language of the statute and attribute the common, ordinary meaning to terms found in everyday speech. *Id.*

The "safe harbor" provision of the IUCCC, entitled "Powers of department; reliance on rules," states, in relevant part:

> No liability is imposed under this article for an act done or omitted in conformity with a rule, written notice, written opinion, written interpretation, or written directive of the department notwithstanding that after the act or omission the rule, written notice, written opinion, written interpretation, or written directive may be amended or repealed, or be determined by judicial or other authority to be invalid for any reason.

Ind.Code Ann. § 24–4.5–6–104(2) (West, PREMISE through 2003 1st Regular Sess.). Looking to the plain language of the statute it is clear that the legislature intended to protect persons or entities from liability that rely upon and act in conformity with a DFI written interpretation of the IUCCC. Common sense dictates that a written interpretation cannot be relied upon if it is not yet in existence. It is undisputed that the DFI written interpretation upon which the Defendants rely was written April 10, 2002—after the instant suits were instigated.[14] Defendants essentially argue that the timing of the DFI letter is of no consequence since their lending practices were allegedly in conformity with the letter's IUCCC interpretation.[15] We disagree. As noted, a plain reading of the statute informs that the legislature intended to protect those who previously relied, potentially to their detriment, on a DFI interpretation of the IUCCC. The heading of the statute, "reliance on rules," and its use of the past tense, "an act *done* or *omitted* in conformity with" supports this reading. I.C. § 24–4.5–6–104 (emphasis supplied).

 Here, neither Bann–Cor nor Independent Realty could have relied upon or acted in conformity with a letter written in 2002 for loans made in 1997 and 2000. Therefore, as a matter of law, the "safe harbor" provision of the IUCCC is inapplicable. Since the "safe harbor" provision is inapplicable to Bann–Cor and Independent Realty, and neither standing nor personal jurisdiction were raised as defenses, the trial court erroneously dismissed the *Simms* and *Drake* suits. We therefore reverse the grant of Independent Realty

14. At oral argument, Defendants' counsel also stated that the DFI letter was in response to a letter from counsel's office regarding the instant litigation.

15. We do not determine if the April 10, 2002, letter qualified as a written interpretation as contemplated by the statute, or if the letter's substantive conclusions regarding the IUCCC were accurate.

and Bann–Cor's motions to dismiss and remand to the trial court for matters consistent with these proceedings.

Judgment affirmed in part, reversed in part, and remanded.

RILEY, J., and SULLIVAN, J., concur.